**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ronald ADAMS, Defendant–Appellant.**

**No. 91–5623.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1992.

Decided March 8, 1993.

---

Thomas W. Smith, Charleston, WV, argued for defendant-appellant.

John Kirk Brandfass, Asst. U.S. Atty., Charleston, WV, argued; Michael W. Carey, U.S. Atty., Charleston, on brief, for plaintiff-appellee.

Before WIDENER, WILKINSON, and WILKINS, Circuit Judges.

## OPINION

WIDENER, Circuit Judge:

Defendant Ronald Adams appeals his sentence for conviction of conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846. Specifically, Adams argues that the district court erred in determining the quantity of drugs attributable to him in his base offense level under U.S.S.G. § 1B1.3(a)(1), and erred in assigning two criminal history points for his prior sentence under West Virginia's Youthful Male Offender Act, W.Va.Code § 25–4–6. We affirm.

On October 19, 1990, a confidential informant working with the Charleston Metropolitan Drug Enforcement Team met with Thomas Adams, the defendant's brother and co-conspirator, in order to make a cocaine base crack sale.[1] They met again on the following day, October 20. At this meeting Thomas Adams told the informant that he wished to purchase five ounces of crack cocaine, and that his brother, the defendant Ronald Adams, wished to purchase two ounces. The parties decided upon a price of $1000.00 per ounce and agreed to meet later in a supermarket parking lot to complete the trade.

The informant was given ten (10) ounces of crack by the observing police officers and sent to the supermarket parking lot at the prearranged time. There, he met again with Thomas Adams. At this meeting, Thomas Adams believed he saw a police

surveillance vehicle, so the meeting was moved to a nearby dead end street. After Thomas Adams examined the crack, he agreed with the informant to complete the transaction at a final meeting place on Roseberry Circle approximately 30–45 minutes later.

At Roseberry Circle, Thomas Adams, David McGhee, and the defendant Ronald Adams all met with the informant. The informant again showed the crack, this time to all three co-conspirators. They agreed to leave David McGhee with the informant while Thomas and Ronald Adams went to get the purchase money. Approximately thirty minutes later Thomas and Ronald Adams returned with the purchase money. Thomas Adams then purchased five ounces of crack from the informant for $5000. Ronald Adams purchased two ounces of crack for what was supposed to be $2,000 but later turned out to be $1,740. Both Ronald and Thomas Adams then handed over the whole amount of purchased crack to David McGhee and asked the informant to give McGhee a ride to the bottom of the hill. Both Ronald and Thomas Adams followed behind the informant's car. Both cars stopped at the bottom of the hill, where David McGhee left the informant and got into the car with Ronald and Thomas Adams, carrying the seven ounces of crack. The observing police officers thereafter converged on the car and arrested Ronald Adams, Thomas Adams, and David McGhee. They also recovered all seven ounces (196 grams) of the crack cocaine.

Ronald Adams was subsequently charged by information with conspiracy to possess with the intent to distribute cocaine base, in violation of 21 U.S.C. § 846. Pursuant to a written plea agreement, Ronald Adams pleaded guilty to the charge contained in the information on January 14, 1991. At this hearing, the district court ordered a presentence report to be prepared for Ronald Adams.

---

**1.** Ronald Adams did not dispute the factual summary of the events leading to his conviction as written in his presentence report. The facts that follow are taken from this summary.

A sentencing hearing was held for Ronald Adams on July 26, 1991. Ronald Adams did not object to the presentence report's description of the offense conduct, which consisted of the facts given above. The report, however, also calculated the entire seven ounces of crack as attributable to Ronald in determining Ronald Adams' base offense level. Ronald Adams objected to the use of this amount to determine his base offense level, arguing that the purchase of five ounces by his brother was a separate transaction and that he should only be sentenced for the two ounces he actually purchased. The district court decided, however, that under the facts as stated above, there was one joint agreement among all three men to buy a total of seven (7) ounces of crack.

Ronald Adams also objected to the use in his presentence report of a prior sentence he received under the West Virginia Youthful Male Offender Act for a breaking and entering conviction. The probation officer had assigned two criminal history points for this sentence as a sentence of imprisonment under the Sentencing Guidelines. Under the West Virginia Youthful Male Offender Act, W.Va.Code § 25-4-6, a criminal court could suspend imposition of a sentence and send a convicted male youth offender to a youth center for a period of confinement of six months to two years, or place him on probation after such a confinement period. Adams received such a commitment as a result of his breaking and entering conviction. He served eight months in the Anthony Center, after which the criminal court suspended the rest of the sentence and placed him on probation for two years.[2]

Ronald Adams argues that the sentence he received for this conviction under the West Virginia Youthful Male Offender Act should not be considered a sentence of imprisonment under the guidelines due to its evaluative purpose and indeterminate character. He argues that the West Virginia Youthful Male Offender Act requires the

sentencing judge to suspend his sentence pending the results of an indeterminate time of evaluation (but of at least six months) in the Anthony Center, and that since the West Virginia court subsequently converted Adams' sentence into a sentence of probation, he should receive only one criminal history point under U.S.S.G. § 4A1.1(c) and § 4A1.2(b), comment. (n. 2) ("A sentence of probation is to be treated as a sentence under § 4A1.1(c) unless a condition of probation requiring imprisonment of at least sixty days was imposed.").

The district court, although recognizing the nature of Ronald Adams' prior sentence under the West Virginia statute, determined nonetheless that it was a prior sentence of imprisonment under the Guidelines. The court decided that Adams' prior sentence was a "condition of probation requiring imprisonment of at least sixty days," U.S.S.G. § 4A1.2, comment. (n. 2), and concluded that Adams should receive two criminal history points under U.S.S.G. § 4A1.1(b).

Ronald Adams was thereafter sentenced pursuant to a criminal history category of II and a total offense level of 32, resulting in a range of 135-168 months. The district court sentenced him to 135 months, at the low end of the guideline range, and a three year term of supervised release.

■ Determinations of the quantity of cocaine base to be considered as relevant conduct for the purpose of calculating a defendant's base offense level are factual in nature and subject to the clearly erroneous standard of review. *United States v. Hicks*, 948 F.2d 877, 881 (4th Cir.1991).

■ Ronald Adams argues that the district court should not have combined the cocaine base from his brother's purchase to determine his own base offense level.

To determine a defendant's base offense level for a violation of 21 U.S.C. § 846 (conspiracy), we first look to § 2D1.4(a) of the Sentencing Guidelines.[3] This section

---

2. The West Virginia court phrased the order as "suspend[ing] the imposition of sentence."

3. U.S.S.G. § 2D1.4(a) provides:

Base Offense Level: If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the

directs us to the guideline of the underlying offense, which in this case was 21 U.S.C. § 841(a). The commentary to § 2D1.4(a) also refers us to § 1B1.3, Relevant Conduct ..., comment. (n. 1) when a defendant, like Adams, is convicted of conspiracy. That Application Note provides, in relevant part:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.

The question presented here, therefore, is whether Ronald Adams' brother's purchase of the five ounces of cocaine base was within the scope of the conspirators agreement or was "conduct of others in furtherance of the execution of jointly undertaken criminal activity that was reasonably foreseeable" to Ronald Adams. If it was, the whole seven ounces (196 grams) purchased by both brothers would be attributable to Ronald Adams, and he would receive, pursuant to the guidelines for the underlying offense, a base offense level of 34.

The district court found that Ronald Adams, together with Thomas Adams and David McGhee, jointly agreed to the purchase of the whole seven ounces of cocaine base, and accordingly attributed the whole amount to Ronald Adams. We are of opinion it did not err. The evidence of the offense conduct tended to show that there was a conspiracy by all three defendants to purchase a total of seven (7) ounces of crack cocaine. All three defendants were present when the crack was actually purchased. All three defendants left the scene together. All of the drug quantity was delivered by the two Adamses to the possession of David McGhee and was in the possession of McGhee when they were arrested. Thomas Adams' purchase of the five (5) ounces of crack was reasonably

foreseeable to Ronald Adams as well as within the scope of the jointly-undertaken agreement. Although the defendant argues that there were two separate transactions, that is not enough. We look to all of the evidence, as the district court has done, not just one isolated fact. As a whole, these facts show a jointly-undertaken criminal agreement in which each defendant committed acts that were reasonably foreseeable to each other in furtherance of the conspiracy. Therefore, we are of opinion the district court was not clearly erroneous in attributing the whole seven (7) ounces of crack to Ronald Adams when it calculated his base offense level.

■ Adams next argues that the district court should not have assigned him two criminal history points for the prior sentence he received under West Virginia's Youthful Male Offender's Act, W.Va.Code § 25-4-6. He contends that the actual time he served at the Anthony Center was wholly suspended, so that his later sentence to two years of probation by the West Virginia state court was not made conditional to any time of imprisonment imposed, thus resulting in the assignment of only one criminal history point. U.S.S.G. § 4A1.2(b), comment. (n. 2) and § 4A1.1(c). We review the legal application of the Sentencing Guidelines under a *de novo* standard of review. *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir.1989).

West Virginia Code § 25-4-6 permits a criminal court to suspend imposition of a sentence for a defendant between the ages of sixteen and twenty-one and commit him to a youthful offender center for six months to two years.[4] If the defendant completes the training program satisfactorily, the statute provides that the court shall immediately place him on probation. This is what occurred in Adams' case. The order entered on August 24, 1983, after Adams' plea of guilty to breaking and entering in the Circuit Court of Kanawha

object of the conspiracy or attempt had been completed.

**4.** The suspension of the imposition of sentence did not take place until April 27, 1984, Adams having been confined by order of August 24, 1983.

County, West Virginia, imposed an indeterminate sentence of six months to two years and committed Adams to the custody of the Department of Corrections "to be imprisoned and maintained in the manner prescribed by law." Adams thereafter served eight months at the Anthony Center, West Virginia's youthful offender facility. In a second order entered April 27, 1984, after Adams was "returned from the West Virginia Center at Neola, West Virginia, under honorable conditions," the court found him eligible for probation, suspended the imposition of his sentence, and placed him on probation for two years.

Adams claims that because this West Virginia Youthful Male Offender scheme allowed the state criminal court to suspend his sentence, and because he was arguably sent to a youthful offender facility for the purpose of treatment, training, and evaluation instead of incarceration, his prior sentence should not be considered a sentence of imprisonment under U.S.S.G. § 4A1.1(b). Instead, he would have us consider his sentence as a sentence of probation, with his time served at the Anthony Center considered a suspended sentence, the result being an assignment of only one criminal history point under U.S.S.G. § 4A1.1(c) and § 4A1.2(b), comment. (n. 2). The question that is presented to us here, therefore, is whether the district court erred when it assigned Adams two criminal history points for this sentence, instead of the one point Adams now argues is correct.

While it is true that the rule of lenity requires that a construction of the statutes involved be favorable to the defendant in case of ambiguity and that the language of the West Virginia statute, which speaks in terms of suspension of imposition of sentence as well as a placement on probation subsequent to the returning of a defendant from a center for youthful male offenders, may not be a model of clarity, there are

two provisions, one in the statute and one in the Guidelines, which should govern this case and which are clear.

The first is that the West Virginia statute specifically requires such a defendant to be committed "to the custody of the West Virginia Commissioner of Public Institutes [Corrections] to be assigned to a center. The period of confinement in the center shall be for a period of six months, or longer...." Pursuant to this statute, the West Virginia court ordered that "the defendant be committed to the custody of the State Department of Corrections for a limited term of not less than six (6) months or more than two (2) years." That order further provided that Adams "be kept imprisoned and maintained in the manner prescribed by law."

The second is that U.S.S.G. § 4A1.2 Comment. (n. 2) provides in pertinent part that "[a] sentence of probation is to be treated as a sentence under § 4A1.1(c) unless a condition of probation requiring imprisonment of at least 60 days was imposed." The provisions just quoted from the West Virginia statute and the Guidelines are not ambiguous. The statute requires confinement in a center for at least six months, and the Guidelines provide, in § 4A1.1(c) for a one-point addition "unless a condition of probation requiring imprisonment of at least 60 days was imposed." So the only question is whether Adams' confinement in the West Virginia center is imprisonment of more than 60 days. The district court decided that it was, and we agree.[5]

The sentence of imprisonment appealed from is accordingly

*AFFIRMED.*

---

**5.** Having concluded that Adams' confinement pursuant to the West Virginia statute was a sentence of imprisonment in excess of 60 days, we note that the district court properly applied § 4A1.1(b) rather than § 4A1.1(a). Although the maximum sentence of confinement Adams faced under the West Virginia statute was two

years, see U.S.S.G. § 4A1.2, comment. (n. 2), the state court, acting in accordance with the West Virginia statute, suspended all of Adams' sentence in excess of eight months' imprisonment. Therefore, the length of Adams' sentence of imprisonment for purposes of applying § 4A1.1 was eight months. See U.S.S.G. § 4A1.2(b)(2).